IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RACHAD AHMED SALAH FARAH AND FATHIA AHMED MOHAMED EL HAG, as Personal Representatives of the heirs of RACHA FARAH, deceased,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE BOEING COMPANY, a Delaware Corporation,<br><br>    Defendant. | No. |

## COMPLAINT

Plaintiffs Rachad Ahmed Saleh Farah and Fathia Ahmed Mohamed El Hag, as Personal Representatives of the heirs of Racha Farah, deceased, bring this action for damages on behalf of, Racha Farah, her estate, heirs, and survivors against Defendant The Boeing Company ("Boeing") as follows:

### INTRODUCTION

1.      This action arises from the horrific crash of Ethiopian Airlines Flight 302 ("Flight 302") on March 10, 2019 in which 157 people lost their lives. The aircraft involved in Flight 302 was a Boeing 737 MAX 8. This crash came less than five months after Lion Air Flight JT 610 – another Boeing 737 MAX 8 – crashed into the Java Sea on October 29, 2018, killing all 189 onboard.

2.      Investigation into both crashes is ongoing, but the similarities in the aircraft and the investigative findings for the crashes thus far point to a common cause. Shortly after taking off and while attempting to climb, pilots for both aircraft reported flight control issues as the planes pitched up and down erratically in the sky. The flight paths and data released thus far for both aircraft show that the pilots were engaged in a terrifying tug-of-war with the plane's automated systems as the pilots manually tried to climb while the computer system repeatedly caused the plane to dive with increasing nose-down trim against the pilot inputs. Pilots of both Flight 302 and Flight 610 lost their fight with Boeing's flight computer, and hundreds of passengers and crew lost their lives due to Boeing's flight computer driving the airplanes into the ground.

3.      Boeing CEO Dennis Muilenburg has said, "it's apparent" that the 737 MAX 8's Maneuvering Characteristics Augmentation System (MCAS) contributed to two fatal air accidents. Investigators had long suspected the system's role in the disasters.

4.      Muilenberg's statement comes on the same day Ethiopian investigators determined that Flight 302's crew, *"had performed all the procedures repeatedly, provided by [Boeing], but was not able to control the aircraft."* Media network CNN, claiming to have seen the full report, described how the pilots fought the plane's MCAS system for the entirety of the six-minute flight, but were unable to pull the plane's nose up and regain control.

5.      The 737 MAX 8 is grounded worldwide following the Ethiopian Airlines disaster, and Boeing is currently previewing a software update that Muilenberg said will *"eliminate the possibility"* of a similar accident happening again. The update will need to be approved by air regulators worldwide before the 737 MAX can take to the sky again.

6.     A group of Boeing engineers told the Seattle Times last month that pilots were unaware of how to override the MCAS system, and Boeing has promised to rectify this too by providing *"additional educational material."* In addition, two critical safety features that could have warned pilots of an impending dive were sold as optional extras by the manufacturer. One of these – a warning light – will now be fitted as standard.

7.     Boeing installed the defective flight control system suspected to be the cause of both crashes to address changes in the aircraft's handling caused by the 737 MAX aircraft's larger and more fuel-efficient engines. Both the design changes boosting fuel efficiency and the unsafe way in which Boeing designed and certified the flight control system were tools to make the 737 MAX aircraft more competitive against rivals like the Airbus A320, which would in turn increase Boeing's sales and profits.

8.     Boeing actively concealed the nature of the automated system defects. Numerous decisions by Boeing's leadership substantially contributed to the subject crash and demonstrate Boeing's conscious disregard for the lives of others, including but not limited to Boeing's role in: designing an aircraft with a powerful automated flight control system susceptible to catastrophic failure in the event of a single defective sensor; failing to properly inform pilots of the existence of the new flight control system and educate and train them in all aspects of its operation; failing to properly address the new system in the aircraft's flight manual; refusing to include key safety features as standard in the aircraft rather than as optional upgrades; delivering 737 MAX aircraft with a version of the flight control system that was materially different from the version presented to the FAA during certification; and failing to take appropriate action after Boeing learned that the 737 MAX aircraft was not performing as intended or safely, as was made tragically clear with the crash of Lion Air Flight JT 610.

9. Boeing's reckless decision to put profits over safety is further evident in Boeing's repeated claims that the 737 MAX 8 is so similar to its earlier models that it does not require significant retraining for those pilots familiar with the older generation of 737s. Boeing has insisted that retraining is not required, even after Lion Air Flight 610 crashed, because airlines would buy fewer Boeing aircraft if pilots needed to be retrained. In so doing, Boeing risked people's lives merely to improve its bottom line and must pay punitive damages to punish and deter Boeing, and others, from doing so again.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. § 1332. Plaintiff Rachad Ahmed Saleh Farah is a citizen of Djibouti and Plaintiff Fathia Ahmed Mohamed El Hag is a dual citizen of Djibouti and France. Defendant Boieng is a corporation based in the State of Illinois. The amount in controversy exceeds the jurisdictional minimum of this Court.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant Boeing is a resident of this District and a substantial part of the events or omissions giving rise to the claim occurred in this District. Key decisions were made by Boeing's corporate leadership in Chicago, including those decisions regarding the development of the 737 MAX, certification of the aircraft, and disclosures to airlines.

## THE PARTIES

12. Decedent Racha Farah ("Decedent") was a passenger on board Flight 302 when it crashed on March 10, 2019. She was a dual citizen of France and Djibouti.

13. After a successful career in finance, Racha Farah decided to pursue her passion for style and began working as a fashion designer. She quickly became renowned for her

creativity and passion. Ms. Farah was a confident, spirited, highly regarded leader who was admired by all who knew her. A true global citizen, Ms. Farah was born in Djibouti, raised in Japan, educated in Canada, and trained in France. She spoke six languages and had been profiled by True Africa on its list of 100 "innovators, opinion-formers, game-changers, pioneers, dreamers and mavericks who are shaping the Africa of today." As the President of the Ethiopian bank where Ms. Farah previously worked described in a heartfelt tribute: "Racha will be remembered as someone who was not afraid to go after her dreams, even if it meant breaking difficult barriers. And she did this with determination, grace and a magnetic spirit."

14.     Plaintiffs Rachad Ahmed Saleh Farah and Fathia Ahmed Mohamed El Hag are the parents of Decedent, and are the Personal Representatives of the heirs of Decedent. On August 21, 2019, the Djiboutian Ministry of Justice's Personal Status Tribunal appointed Plaintiffs to represent Decedent's heirs and to recover any damages or compensation on behalf of Decedent's estate. Rachad Ahmed Saleh Farah and Fathia Ahmed Mohamed El Hag bring this action on her behalf and the behalf of her estate, heirs, survivors, and beneficiaries (hereinafter "Plaintiff").

15.     At all relevant times Defendant Boeing was a Delaware corporation with its principal place of business in the State of Illinois. Boeing is, and at all relevant times was, registered with the Illinois Secretary of State as doing business in Illinois, and it does business in Illinois and in this Judicial District. Boeing's headquarters, where the relevant decisions and omissions giving rise to this action were made, authorized, ratified and/or approved, are located in this District.

## STATEMENT OF FACTS

***Boeing's CEO Admits Fault***

5

16.     Boeing CEO Dennis Muilenburg has said, "it's apparent" that the 737 MAX 8's MCAS maneuvering system contributed to two fatal air accidents. Investigators had long suspected the system's role in disasters.

17.     In addition, James F. Albaugh of Boeing's commercial airplanes division, told employees at a meeting in January 2011 that Airbus' decision to redesign its existing aircraft with larger engines would be "a design change that will ripple through the airplane" and present significant challenges.[1]

18.     Boeing's tune changed when it learned that some of its key customers, including American Airlines, would be placing orders with Airbus for their fuel-efficient aircraft. This ratcheted up pressure on Boeing to respond. Since the design of an entirely new jet would take too long, Boeing decided to create a more fuel-efficient alternative to its traditional 737NG aircraft – what would become the 737 MAX.

19.     A former senior Boeing official reported that the company opted to build the 737 MAX, rather than an entirely new aircraft, because it would be "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."[2]

20.     Rick Ludtke, an employee at Boeing for 19 years and an engineer who helped design the 737 MAX cockpit explained that "[a]ny designs we created could not drive any new training that required a simulator." That was the first ground rule communicated to engineers designing the MAX. This created a chaotic environment for engineers. As Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted

---

[1] David Gelles, Natalie Kitroeff, Jack Nicas, and Rebecca R. Ruiz, "Boeing 737 Max: A jet born of a frantic race to outdo a rival," New York Times, March 24, 2019.
[2] *Id*.

the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."[3]

21.     The need to minimize design changes served an important business need for Boeing. If airline pilots did not require costly and time-consuming training in the new aircraft because it was viewed as merely an update to the familiar 737NG, it would make the 737 MAX cheaper for airlines to operate. This in turn would make the price for the 737 MAX more competitive relative to the Airbus A320neo and far more profitable for Boeing.

22.     Thus, Boeing needed the 737 MAX aircraft to be more fuel efficient and also handle similarly to the 737NG. The MAX aircraft was able to achieve this new fuel efficiency, in part, due to the model's larger engines, the CFM LEAP-1B Engine. However, adding the larger engines triggered cascading design and engineering changes for the aircraft, the same ripple of changes James Albaugh, Boeing's commercial airplanes chief executive, had predicted back in 2011 when criticizing Airbus' A320neo.

23.     The larger engines could not be mounted in the same location as the engines on the 737NG so they had to be moved further forward on the plane, which in turn required moving the forward landing gear. The more powerful engines, coupled with their new location, caused the 737 MAX to handle differently from the 737NG by changing the plane's lift characteristics. A 737NG pilot operating the 737 MAX would find that the 737 MAX would ascend faster and at a higher angle, increasing the risk of a stall.

24.     As Boeing's business leaders required engineers to contain the level of change to avoid pilot retraining and make the 737 MAX more marketable, Boeing now needed to engineer a band-aid to fix the aircraft's handling issues created by the larger and more powerful engines.

***Boeing Knew MCAS Was Defective And Dangerously Flawed***

[3] *Id.*

25.     Boeing included a new automated flight-control system in the MAX aircraft, the Maneuvering Characteristics Augmentation System (MCAS) to address the risk of a stall.

26.     However, as Boeing's CEO has acknowledged MCAS contributed to both the Lion Air and Ethiopian Air crashes.

27.     The MCAS collected data from a single sensor on the fuselage called the angle-of- attack sensor ("AOA sensor") which measures the angle between the wing of the plane on the oncoming airflow at the front of the plane. If the AOA sensor registers that the angle is too high – that the plane is climbing too sharply – then the MCAS activates, automatically swiveling the horizontal tail of the plane to move the plane's nose down, as can be seen in the following graphic:



28.     The MCAS was not programmed to use data from both of the airplane's AOA sensors to help validate the AOA data and protect against single point failures. This meant that if

the single AOA sensor used as input to the MCAS malfunctioned and erroneously believed the plane was climbing too quickly, then there was no means of detecting the error and excluding that data to prevent the MCAS from improperly intervening and forcing the plane to dive.

29.     The MCAS was intended to automatically adjust the pitch of the plane to avoid stalling with the MAX's more powerful engines when the plane was being controlled manually by the pilot. The pilot would not need to manually activate the MCAS, nor would the aircraft inform the pilot that the MCAS system was making pitch trim inputs.

30.     In November 2016, Mark Forkner, Boeing's chief technical pilot for the MAX, wrote in messages to a Boeing colleague that the MCAS was "running rampant" in a flight simulator, as a result of which "the plane is trimming itself like cra[z]y." Mr. Forkner described his reaction: "I'm like, WHAT?" He added that the malfunction was "egregious." Yet Boeing took no meaningful action to correct the problem.

31.     Astoundingly, since the MCAS was intended to operate in the background without pilot knowledge, Boeing did not even inform pilots that the MCAS existed. The MCAS was not disclosed in the aircraft's flight manual either. Pilots would only learn indirectly about the MCAS when the plane began automatically fighting their pitch commands, often at low altitudes with little time to react and resolve the issue.

32.     A Boeing executive met with pilots' union representatives in November 2018, after the Lion Air crash. According to pilot Dennis Tajer who was in attendance, Boeing executives tried to excuse their failure to disclose this system by explaining that they did not wish to "inundate" pilots with too much information about the new plane.[4] Frustrated, pilot unions have described Boeing's actions in failing to disclose the software as a "breach of trust."[5]

---

[4] https://www.nytimes.com/2019/03/16/business/Boeing-max-flight-simulator-ethiopia-  lion-air.html
[5] *Id.*

*Boeing Ignored Safety in Pursuit of Profits*

33.  The New York Times interviewed several of the engineers and designers

working on the MAX who described the tremendous pressure placed on them to quickly get the

MAX's developed:

  a.  An engineer working on the MAX said that "[t]he timeline was extremely
      compressed … It was go, go, go."[6]

  b.  A former designer working on the MAX's flight controls described how the design
      team had at times produced 16 technical drawings a week, double the normal rate.
      The designer understood the message from management to be: "We need something
      now."[7]

  c.  A technician who assembles wiring on the MAX said that he received sloppy
      blueprints in the first few months of development and was told that the instructions
      for the wiring would be cleaned up later in the process. However, his internal
      assembly designs for the MAX apparently still include omissions today, such as not
      specifying which tools to use to install a certain wire, a situation that could lead to a
      faulty connection. This is quite different from standard procedures because normally
      such blueprints include intricate instructions.[8]

34.  On information and belief, the unreasonable expectations placed on engineers and

designers by the corporate business leadership centered in Chicago created an environment at

Boeing facilities which was ripe for mistakes and wherein employees were reluctant to raise

concerns that could risk delaying certification and production of the MAX.

35.  A lawsuit filed in state court in South Carolina on March 16, 2019 by a former

Boeing Quality Assurance Conformity Manager calls into question the integrity of Boeing's

testing and inspections procedures. This manager was tasked with inspecting all newly

manufactured aircraft for compliance with internal engineering and safety specifications. Each

---

[6] New York Times, *Boeing 737 Max: A jet born of a frantic race to outdo a rival*; by David Gelles,
Natalie Kitroeff, Jack Nicas, Rebecca R. Ruiz, March 24, 2019.
[7] *Id.*
[8] *Id.*

incidence of non-conformity that Boeing inspectors encounter is supposed to be documented by Boeing, as are all repairs and subsequent inspections.

36.    According to the manager's complaint, at one of Boeing's manufacturing plants, Boeing agents and/or employees engaged in improper conduct including:

a.    "Goldplating," which means repeating a test until it is successful and then making records show that the test was successful on the first attempt;

b.    Knowingly using out of date engineering specifications;

c.    Knowingly using uncertified technicians to perform maintenance and repairs;

d.    Violating the internal Boeing policy and procedures that were put in place to achieve final approval of each stage of production and make the plane immediately saleable;

e.    Disabling the automated system that notified all pertinent employees of mandatory inspections of newly manufactured aircraft; and

f.    Submitting conformities without documented repairs.

37.    The manager also alleges that when he tried to document non-conforming aircraft equipment, he was threatened, retaliated against, subjected to a hostile work environment, and eventually terminated.

38.    On information and belief, this manager's allegations relating to violations of safety standards, falsified inspection records, and an environment of distrust and retaliation, are representative of wrongful conduct and violation of safety protocols at other Boeing manufacturing facilities.  These issues were known, encouraged and/or ratified by Boeing's leadership and contributed to a culture that suppressed voices raising the alarm about safety in furtherance of Boeing's profit-driven focus.

***Boeing Conducted a Flawed Safety Assessment of The MCAS And Falsified Data to the FAA***

39. In addition to the questions about Boeing's design and manufacturing procedures at the time of the MAX was undergoing design and certification, the protocols for Boeing's safety assessment of the MCAS showed glaring errors.

40. The MCAS was designed to swivel the horizontal tail to push the nose of the plane down to avert a stall. Boeing tested this system, but the safety analysis understated the power of the system.

41. Boeing submitted documentation to the FAA indicating that the MCAS could only move the horizontal tail a maximum of 0.6 degrees. However, when the MAX 8 was put into service, the MCAS was capable of moving the tail 2.5 degrees, more than four times the 0.6 degrees stated in the initial safety analysis provided to the FAA. The version of the MCAS that Boeing embedded in its aircraft and sold all over the world was materially different and far more powerful than what Boeing represented to the FAA and other regulatory agencies. The FAA did not learn that the MCAS would move the horizontal tail 2.5 degrees until after 189 people were killed in the Lion Air crash.

42. The safety analysis also failed to account for how the MCAS could reset itself after each time a pilot responded. This meant that a malfunctioning MCAS would not just cause a single downward movement of 2.5 degrees, but could dip the nose of the aircraft 2.5 degrees lower multiple times as the pilot tries to regain control. Without correction, two cycles of the MCAS at the 2.5 degree limit could cause the aircraft to reach its maximum nose-down trim position. Peter Lemme, a former Boeing flight controls engineer, explained to the Seattle Times that, since the MCAS can reset each time it is used, "it effectively has unlimited authority." [9]

---

[9] https://www.seattletimes.com/business/Boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

43.     Based on Boeing's own flawed assumptions – that the MCAS' maximum authority was 0.6 degrees – Boeing's System Safety Analysis classified a potential MCAS malfunction as a "major failure" in normal flight and a "hazardous failure" in the event of an extreme maneuver, such as a banked descending spiral.[10] A "major failure" indicates that the system's failure could cause physical distress to people on the plane, but not death. A "hazardous failure" could cause serious or fatal injuries to a small number of passengers. One level above hazardous failure is "catastrophic failure," which represents the loss off the plane with multiple fatalities.

44.     The failure classification system is important because it drives whether a flight control system can rely on a single sensor input or must have two or three. Systems with a consequence of failure classified as a "major failure" must have a probability of failure less than one in 100,000. Typically, such systems are allowed to rely on a single input sensor.[11]

45.     In contrast, systems classified as "hazardous failure" have more severe consequences of failure and therefore must have a probability of failure less than one in 10 million. Systems classified as "hazardous failure" typically must have at least two separate input channels as a backup in the event one sensor fails.[12]  Given its a potential for a "hazardous failure," the MCAS should have had a redundant back-up system. Instead the MCAS could be triggered by a reading from a single AOA sensor and, once triggered, it had unlimited authority to pitch the nose of the aircraft down.

46.     Boeing had a second AOA sensor on the airplane that it could have used to provide redundancy and safety, and which it is now using in its MCAS software "fix" after these

---

[10] *Id.*
[11] *Id.*
[12] *Id.*

two fatal accidents, but it chose not to do so during design and certification to save whatever time and money it could. Boeing did the same thing in its design of the 737 auto-throttle system prior to the 2009 Turkish Airlines Flight 1591 crash in Amsterdam, relying on a single sensor input instead of two readily available inputs – and after that accident quickly issued a software fix to prevent recurrence. Boeing should have learned from that accident to never try to save money via single sensor reliance on critical systems, but once again did so on the 737 MAX MCAS design, costing Decedent and others their lives.

47.     As Boeing's former flight controls engineer, Peter Lemme, told the Seattle Times: "A hazardous failure mode depending on a single sensor, I don't think passes muster."[13]

48.     Boeing has repeatedly and intentionally violated this system safety design principle and egregiously abused its FAA certification designee position to allow it to pass certification muster, resulting in hundreds of Boeing airplane passenger deaths and injuries.

---

[13] *Id.*

***Boeing Rejected Multiple Options to Make Its Plane Safer***

49. Despite the MCAS' glaring flaws, Boeing had two available safety features that could mitigate the risk of the AOA sensor failing and causing an uncontrolled dive, but consciously chose to make these safety features optional add-ons for airlines and charge extra. One such feature is an angle of attack indicator, which would display the readings from the AOA sensor.[14] Without this upgrade, pilots do not have a reading of what the AOA is registering, making it more difficult to identify an AOA malfunction.

50. The other safety feature is called a disagree light. The MAX 8 comes outfitted with two AOA sensors at the front of the plane, but the MCAS only takes readings from one sensor on any given flight, leaving the system vulnerable to a single point of failure. Upgrades to the MCAS software coupled with the installation of a disagree light in the cockpit would alert pilots if the two AOA sensors register readings at odds with one another.

51. Aviation analyst, Bjorn Fehrm, told the New York Times that these safety features are "critical" and "cost almost nothing for the airlines to install."[15] Upgrades to the MCAS software could also program the system to turn off in the event the two AOA readings are materially out- of-sync.[16]

52. Despite the potential for the AOA sensor failing and wrongfully activating the MCAS to force the plane downward, Boeing did not install the AOA indicator or disagree light as standard. Instead, Boeing charges a premium for these essential safety features.[17]

---

[14] https://www.nytimes.com/2019/03/21/business/Boeing-safety-features-charge.html
[15] *Id.*
[16] https://www.nytimes.com/2019/03/21/business/Boeing-safety-features-charge.html
[17] *Id.*

***Boeing Misrepresented Its Aircraft to Pilots and Airlines, Downplaying the Need for Essential Training***

53.     With the MAX 8 certified by the FAA, Boeing began delivering aircraft all over the world starting in May 2017. The MAX 8 was an extremely popular aircraft and extremely profitable for Boeing.[18]

54.     As Boeing had intended, pilots transitioning from the older 737s to the 737 MAX 8 were not required by the FAA to receive extensive training on the 737 MAX aircraft because it obtained the same "type rating" as early 737 models. This was a primary selling point for the MAX as it was presented to airlines. On its website, Boeing represented to airlines that "as you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737."[19]

55.     Due to Boeing's representations regarding the MAX's similarity to the 737NG, pilots have reported that they were given just 56 minutes of training on an iPad about the differences between the new Boeing MAX planes and the older 737s. The MCAS system was not discussed during this training.

56.     With simulators for the new aircraft unavailable at the time the 737 MAX was pressed into service, pilots with United Airlines put together their own 13-page guide to the 737 MAX, but even this guide failed to mention the MCAS, leaving pilots unprepared to deal with a sudden and unexpected dive by the automated systems in the aircraft that they did not know existed.[20]

---

[18] https://www.newyorker.com/news/our-columnists/how-did-the-faa-allow-the-Boeing-   737-max-to-fly
[19] https://www.seattletimes.com/business/Boeing-aerospace/failed-certification-faa-   missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/
[20] https://www.nytimes.com/2019/03/16/business/Boeing-max-flight-simulator-ethiopia-   lion-air.html

57.     American Airlines pilot union representative and 737 pilot, Dennis Tajer,
explained: "When you find out that there are systems on it that are wildly different that affect the
performance of the aircraft, having a simulator is part of a safety culture...It can be the
difference between a safe, recoverable flight and one that makes the newspapers."[21]

***Lion Air Flight JT 610 Crashes After Pilots Experience a Flight Control Issue***

58.     On October 29, 2018, Lion Air flight JT 610 ("Flight 610") departed Jakarta,
Indonesia. Shortly after takeoff, the pilots complained of flight control issues as the plane
repeatedly pitched down despite the pilots' efforts to climb. The pilots reported unreliable
airspeed and altitude readings. Audio recordings from the cockpit contain the rattle of a stick
shaker, a device used to alert pilots of a potential stall, which can occur when a plane ascends too
quickly.

59.     The pilots requested permission to return to Jakarta, which was granted, but the
plane did not return. Satellite data showed the plane rising and falling repeatedly – more than 20
times – as the pilots struggled to wrest control back from the automated systems. Within just 12
minutes of taking off, Flight 610 crashed into the Java Sea, killing all 189 people onboard.

60.     The cockpit voice recording recovered from the wreckage revealed that while
the plane danced perilously across the sky, one of the pilots flipped through a technical manual
in an attempt to identify the problem while the other pilot prayed.[22] The pilots appeared unaware
of the MCAS and its potential role in overriding their manual controls.[23]

61.     Preliminary analysis of the crash and data obtained from the plane's flight data
recorder (FDR) show that one of the AOA sensors produced a reading that was at least 20

---

[21] https://www.nytimes.com/2019/03/16/business/Boeing-max-flight-simulator-ethiopia- lion-air.html
[22] https://www.nytimes.com/2019/03/20/world/africa/ethiopian-airlines-Boeing.html
[23] https://www.nytimes.com/2019/03/20/world/asia/lion-air-crash-Boeing.html

degrees different from the other AOA sensor as the plane took off and began its climb. This strongly suggests that a malfunction in the AOA sensor feeding information to the MCAS triggered an unwarranted activation of the MCAS system at low altitudes, causing the plane's nose to pitch down.

***Boeing Failed to Take Necessary Action***

62.     Following the tragic crash of Lion Air Flight 610, Boeing knew or had reason to suspect that a malfunction in the AOA sensor and MCAS may have been responsible. Boeing issued an Emergency Airworthiness Directive ("AD") on November 6, 2018 identifying the potential danger presented by the flight control system, but not providing clear instruction on what pilots should do in the event of an AOA failure:

> "This AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for *repeated nose-down trim commands of the horizontal stabilizer*. We are issuing this AD to address this potential resulting nose-down trim, which could *cause the flight crew to have difficulty controlling the airplane*, and lead to *excessive nose-down altitude, significant altitude loss, and possible impact with terrain*."

63.     The flight path of Lion Air flight 610 suggests that the malfunctioning AOA sensor and nose-down commands were a factor in the crash:



**How Lion Air flight 610's takeoff compares with a typical flight**

Altitudes in 10 minute period:

64.     Boeing issued the Airworthiness Directive and began investigating a software patch to address the issue, but did not insist on further training of pilots to deal with the defective AOA sensor or MCAS software. Boeing also downplayed the significance of the threat presented by the MCAS and did not call for any aggressive action to prevent further incidents.

65.     Boeing has maintained that the failure of the MCAS could be handled in the same way as a standard "stabilizer runaway," a malfunction which occurs when the Trimmable Horizontal Stabilizer (THS) on the aircraft tail fails to stop at the selected position and continues to deflect up or down.

66.     Pilots and aviation experts have challenged Boeing's characterization because the MCAS failure does not behave like a runaway stabilizer. First, with a runaway stabilizer,

there is continuous uncommanded movement of the tail. In contrast, the movement of the tail is not continuous in a MCAS failure: pilots are able to counter the nose down movement, only to have the MCAS move the tail once again. Second, the MCAS alters the control column response to the stabilizer movement. Pulling back on the column normally interrupts any stabilizer nose-down movement, but with MCAS operating that control column function is disabled.[24]

67.     Boeing's attempts to deflect blame onto purportedly poorly trained pilots wrongfully minimizes Boeing's responsibility for these crashes. It is foreseeable that pilots would be confused by MCAS' control over the 737 MAX 8, as the system's nose-down commands were different from a common stabilizer problem and because pilots were not told the MCAS existed or how it functioned. When seconds matter, the confusion caused by Boeing's defective and unsafe design, and failure to inform pilots, is the difference between life and death.

68.     Both before and after the Lion Air crash, several pilots anonymously submitted on the Aviation Safety Reporting System ("ASRS") complaints which described similar flight control issues and unanticipated dives with the 737 MAX aircraft. One such report submitted by a pilot in November 2018 – after the Lion Air crash and before the Ethiopian Airlines crash – describes the pilot's reaction to learning of the MCAS system:

> "*I think it is unconscionable that a manufacturer, the FAA, and the airlines would have pilots flying an airplane without adequately training, or even providing available resources and sufficient documentation to understand the highly complex systems that differentiate this aircraft from prior models*. The fact that this airplane requires such jury rigging to fly is a red flag. Now we know the systems employed are error prone–even if the pilots aren't sure what those systems are, what redundancies are in place, and failure modes.

---

[24] See https://www.seattletimes.com/business/Boeing-aerospace/failed-certification-faa-   missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/

I am left to wonder: what else don't I know? *The Flight Manual is inadequate and almost criminally insufficient.* All airlines that operate the MAX must insist that Boeing incorporate ALL systems in their manuals."

69.     Shortly after Flight 610 crashed, and after learning of numerous complaints regarding similar close calls, Boeing knew that hundreds of its 737 MAX 8 aircraft were still in use carrying passengers all over the globe, which presented a substantial risk that a similar incident could occur without appropriate and immediate intervention.

70.     Despite this knowledge and the gravity of the risks presented to passengers, crew, and the public at large from imperiled airplanes flying overhead, Boeing consciously and intentionally failed to act, and/or acted without the urgency commensurate with the risk of harm presented by its defective and dangerous aircraft.

71.     On information and belief, Boeing chose not to respond to the Flight 610 crash with the appropriate degree of urgency or with appropriate safety steps because it feared doing so would result in financial loss to Boeing if airlines grounded their aircraft or had to retrain their pilots. Instead, motivated by profit, Boeing downplayed the danger presented by its defective and dangerous aircraft, creating a false sense of security and ensuring that the 737 MAX 8 would still be utilized to carry passengers despite the presence of the defective and dangerous AOA sensor and MCAS.

*Ethiopian Airlines Flight 302 Crashes, Killing All 157 People on Board*

72.     On March 10, 2019, Flight 302 took off from Addis Ababa towards its

destination of Nairobi, Kenya. Within one minute of its departure, the pilot calmly radioed that

he was having flight control problems. Within three minutes, now panicked, the pilot requested

permission to return back to Addis Ababa. The plane was accelerating abnormally and oscillating

up and down. Shortly thereafter, all communication with Flight 302 stopped and the plane

violently crashed into a field killing all 157 people aboard, including Rachah Farah.



By Scott Reinhard | Source: Path data from Flightradar24

73.     The similarity between data from Flight 302 and Flight 610 released to date

suggests that both aircraft experienced an erroneous AOA reading and activation of the MCAS.

On Flight 302, the aircraft's nose began to pitch down just 450 feet above the ground. The jack

screws from the horizontal tail stabilizer were recovered from both crashes and both showed that

the planes had been oriented in a dive with the nose pointing down. Both pilots reported flight

control issues and could not maintain a steady altitude or speed with similarly erratic flight paths

before crashing.

74.    The following side-by-side comparison reveals the striking similarities between the two doomed aircraft in terms of altitude and vertical speed changes:



75.    Regulators finally decided to ground the 737 MAX aircraft in the wake of the Flight 302 crash to allow for a MCAS software upgrade and safety assessment to be conducted. The Department of Transportation, with assistance from the FBI, are now investigating the MAX's certification process, a federal grand jury probe has been empaneled, and Congressional hearings are underway.

76.    Whistleblowers have now come forward reporting that safety inspectors with the FAA, including those in the Aircraft Evaluation Group (AEG) responsible for evaluating the safety of the 737 MAX, lacked the proper training and certifications to do their jobs. To make matters worse, information obtained from whistleblowers purportedly indicates that the FAA was aware that its inspectors lacked proper training and certification as early as August 2018, well before the crashes of Flight 610 and Flight 302.

**COUNT I**
*Negligence*

77.     Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

78.     At all relevant times hereinabove set forth, Defendant Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8 aircraft. Defendant Boeing was, at all times relevant, in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable and safe for passenger air transportation, including the subject Boeing 737 MAX 8 that crashed in Ethiopia on March 20, 2019.

79.     At all relevant times hereinabove set forth, Defendant Boeing operated, supervised, managed and/or oversaw the training facility that trained Ethiopian Airlines' pilots to fly the Boeing 737 MAX 8.

80.     At all times hereinabove set forth, Boeing breached its duty of care to Decedent as a passenger aboard Flight 302 with respect to the design, manufacture, inspection, testing, assembly, certification, distribution, and/or sale of a safe, airworthy aircraft; including the failure to train, instruct, and/or issue advisory warnings necessary to assure the safe operation, control, management and/or maintenance of the aircraft. Boeing's acts and/or omissions include, but are not limited to the following:

     a.     designing, manufacturing, assembling and/or certifying an aircraft with an anti-stall system controlled by a single AOA sensor which was susceptible to failure without redundant systems;

     b.     designing, manufacturing, assembling and/or certifying an aircraft with a flight control system susceptible to erroneous information from the AOA sensor, and failing to install AOA indicators and/or AOA disagree lights as standard features rather than optional upgrades;

c.    designing, manufacturing, assembling and/or certifying an aircraft with a flight control system that would initiate a dangerous automated dive without any command from a pilot and without a means to promptly override the automated dive;

d.    marketing and selling the 737 MAX 8 as an analog to Boeing's 737NG to consciously and intentionally induce airlines to avoid the time-consuming retraining of airline pilots with the knowledge that the MAX 8 contained a new and potentially dangerous MCAS automated flight control system;

e.    failing to provide adequate warning with regard to the 737 MAX 8's MCAS and the risk of an automated dive without any command from a pilot, or clear instruction to promptly override such an MCAS automated dive;

f.    failing to conduct a thorough and accurate safety assessment of the aircraft, including Boeing's failure in its safety assessment to account for the degree to which the MCAS could move the horizontal stabilizer of the aircraft and failure to account for the resetting of the automated dive after each command from a pilot;

g.    failing to properly train pilots on the new automated MCAS systems on the 737 MAX 8;

h.    failing to properly train pilots to identify an AOA sensor failure and MCAS input;

i.    failing to properly train pilots to disengage the stabilizer trim motor on the 737 MAX 8 in the event of an AOA sensor failure or unanticipated dive;

j.    designing, assembling, and distributing a flight manual that did not warn of the risks presented by the MCAS, faulty AOA sensors, or automated dives;

k.    designing, manufacturing, assembling and/or certifying an airplane flight manual that failed to provide clear instruction or procedures on how to promptly override an automated MCAS dive;

l.    failing to promptly issue a software patch to address the risk of malfunctioning AOA sensors and automated MCAS dives following the October 29, 2018 crash of Lion Air Flight JT 610;

m.    failing to ground all 737 MAX 8 aircraft following the crash of Lion Air Flight JT 610 until such a software patch and/or other safety procedures could be implemented;

   n.    failing to properly warn pilots, airlines, and the public of the risk of
         malfunctioning AOA sensors and automated MCAS dives following the crash of
         Lion Air Flight JT 610.

81.    As a direct and legal result of Defendant Boeing's negligence, carelessness,

gross negligence, recklessness and/or otherwise wrongful acts and/or omissions hereinabove set

forth, Decedent died in the crash of Flight 302.

82.    As a direct and legal result of the wrongful acts and/or omissions hereinabove

set forth, Decedent suffered pre-impact injury and death, including fear of impending and

imminent death, and Plaintiffs and the other heirs of Decedent have been damaged by the death

of Decedent.

83.    As a direct and legal result of the wrongful acts and/or omissions of Defendant

Boeing, hereinabove alleged, Plaintiffs and the other heirs of Decedent suffered and continue to

suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection,

affection, and/or moral support from Decedent, as well as other pecuniary injuries including

grief, sorrow, and mental suffering in an amount to be determined at trial.

84.    As a further direct and legal result of the wrongful conduct of Boeing set forth

above, Plaintiff and the other heirs of Decedent incurred funeral and/or burial expenses and/or

related medical expenses in an amount according to proof at trial.

85.    As a further direct and legal result of the wrongful conduct of Boeing set forth

above, Plaintiff and the other heirs of Decedent suffered economic losses, including but not

limited to the loss of financial support, and/or the loss of household services in an amount

according to proof of trial.

86.    The potential harm to airline passengers, pilots, crews, and the public from the

737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively

known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

87.     As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs and the other heirs of Decedent have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to Plaintiffs and the other heirs of Decedent and the imposition of all damages described above.

88.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs and the other heirs of Decedent additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to Plaintiffs' actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

## COUNT II
### *Breach of Warranty*

89. Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

90. Boeing was the designer, manufacturer, distributor and/or seller of the Boeing 737 MAX 8, and/or its component parts, involved in the subject crash.

91. Prior to the crash of Flight 302, Boeing expressly and/or impliedly warranted and represented that the subject aircraft (the Boeing 737 MAX 8) including its component parts and instruments, and in conjunction with the instructions and warnings given by Boeing, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used.   Additionally, Boeing further warranted that the subject aircraft, and its component parts, was free from all defects.

92. Boeing breached said warranties in that the subject aircraft was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and free from all defects as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines.

93. Decedent, as a passenger of Flight 302, was an intended third-party beneficiary of Boeing's warranties that Flight 302 (the Boeing 737 MAX 8 and its component parts) was airworthy, of merchantable quality, both fit and safe for the purposes for which it was designed, intended and used, and free from all defects.

94. Decedent reasonably relied on these warranties to Decedent's detriment

95. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and

imminent death, and Plaintiffs and the other heirs of Decedent have been damaged by the death of Decedent.

96.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, Plaintiffs and the other heirs of Decedent suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

97.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

98.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

99.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's

identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

100.     As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs and the other heirs of Decedent have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to Plaintiffs and the other heirs of Decedent and the imposition of all damages described above.

101.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs and the other heirs of Decedent additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to Plaintiffs' and the other heirs of Decedent actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

## COUNT III
### *Strict Liability*

102.     Plaintiffs incorporate and re-allege each of the paragraphs set forth above as though fully set forth herein.

103.     Boeing designed, manufactured, distributed and/or sold the Boeing 737 MAX 8, and its components parts, involved in the incident. Boeing was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting

aircraft as suitable for passenger air transportation, including the subject Boeing 737 MAX 8, and its component parts, that crashed in Ethiopia on March 10, 2019.

104.     At all times relevant hereinabove set forth, the subject Boeing 737 MAX 8 aircraft, and its component parts, was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

105.     At all times relevant hereinabove set forth, the subject Boeing 737 MAX 8, and its component parts, were defective, dangerous, unsafe, and not airworthy by reason of Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft, and its component parts, as set forth above. The aircraft, and its component parts, were in substantially similar condition to its original condition at delivery to Ethiopian Airlines.

106.     As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs and the other heirs of Decedent have been damaged by the death of Decedent.

107.     As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, Plaintiffs and the other heirs of Decedent suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

108.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

109.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

110.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

111.     As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs and the other heirs of Decedent have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by

Boeing to Plaintiffs and the other heirs of Decedent and the imposition of all damages described above.

112.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs and the other heirs of Decedent additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to Plaintiffs' and the other heirs of Decedent actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

## COUNT IV
### *Failure to Warn*

113.     Plaintiffs incorporate and re-alleges each of the paragraphs set forth above as though fully set forth herein.

114.     Defendant Boeing designed, manufactured, distributed and/or sold the Boeing 737 MAX 8 involved in the incident. Defendant Boeing was in the business of designing, testing, manufacturing, selling, assembling, building, distributing, marketing and/or inspecting aircraft as suitable for passenger air transportation, including the subject Boeing 737 MAX 8 that crashed in Ethiopia on March 10, 2019.

115.     At all times relevant hereinabove set forth, the subject Boeing 737 MAX 8 aircraft was being operated by Ethiopian Airlines and used for the purposes of which it was manufactured, designed, inspected, sold and intended to be used, in a manner reasonably foreseeable to Defendant Boeing.

116.    At all times relevant hereinabove set forth, the subject Boeing 737 MAX 8 was defective, dangerous, unsafe, and not airworthy by reason of Defendant Boeing's defective manufacture, design, warning systems, inspections, testing, service, and/or maintenance of the subject aircraft as set forth above.

117.    At all times relevant hereinabove set forth, Boeing had knowledge that the subject Boeing 737 MAX 8 was defective, dangerous, unsafe, and not airworthy, and in particular, Boeing had knowledge of the unreasonably unsafe design of the AOA sensor and automated MCAS, as well as the potential life and death risks of such a failure in these systems.

118.    At all times relevant hereinabove set forth, the risks of failure of the Boeing 737 MAX 8 due the aircraft's unreasonably dangerous and defective design presented a substantial danger when the aircraft is used or misused in an intended or reasonably foreseeable way.

119.    Ordinary consumers, including but not limited to airlines, flight crew, and passengers, would not have recognized the potential risks presented by the aircraft's unreasonably dangerous and defective design.

120.    As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs and the other heirs of Decedent have been damaged by the death of DECEDENT.

121.    As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, Plaintiffs and the other heirs of Decedent suffered and continues to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including

122.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

123.     As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

124.     The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

125.     As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs and the other heirs of Decedent have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to Plaintiffs and all heirs of Decedent and the imposition of all damages described above.

126.     Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs and the other heirs of Decedent additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to Plaintiffs' and the other heirs actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

### COUNT V
#### *Civil Conspiracy*

127.     Plaintiffs incorporate and re-alleges each of the paragraphs set forth above as though fully set forth herein.

128.     Defendant Boeing entered into an agreement with the FAA, and its agents, employees, and/or directors, and/or other persons and/or entities to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means.

129.     Boeing and its co-conspirators committed tortious and/or unlawful acts in furtherance of this agreement, including but not limited to, deceiving the public as to the safety of the 737 MAX 8 aircraft and its component parts and systems, certifying the aircraft and the MCAS manuals or informing pilots as to automated systems embedded in the 737 MAX 8 aircraft, denying technical experts the necessary time or resources to thoroughly evaluate the 737 MAX 8 aircraft, and compelling technical experts to certify the aircraft despite their concerns about the safety of the 737 MAX 8, all in violation of applicable laws, regulations, and mandatory duties.

130. As a direct and legal result of the wrongful acts and/or omissions hereinabove set forth, Decedent suffered pre-impact injury and death, including fear of impending and imminent death, and Plaintiffs and the other heirs of Decedent have been damaged by the death of Decedent.

131. As a direct and legal result of the wrongful acts and/or omissions of Defendant Boeing, hereinabove alleged, Plaintiffs and the other heirs of Decedent suffered and continue to suffer the loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedent, as well as other pecuniary injuries including grief, sorrow, and mental suffering in an amount to be determined at trial.

132. As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent incurred funeral and/or burial expenses and/or related medical expenses in an amount according to proof at trial.

133. As a further direct and legal result of the wrongful conduct of Boeing set forth above, Plaintiffs and the other heirs of Decedent suffered economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial.

134. The potential harm to airline passengers, pilots, crews, and the public from the 737 MAX 8 was objectively foreseeable both in nature and in scope and were subjectively known to Boeing for all of the aforementioned reasons, including but not limited to: Boeing's own safety assessment of the AOA sensor and MCAS during development of the 737 MAX 8 which revealed potential problems with the system; the evidence that flight control issues caused the crash of Lion Air Flight 610 and death of 189 people; complaints lodged by pilots in the ASRS database regarding the performance of the MCAS, the lack of clear instruction and

training, and the incidence of unexpected MCAS dives and flight control issues; and Boeing's identification of a software upgrade to address problems with the AOA sensors and MCAS in the weeks and months prior to the crash of Flight 302.

135.    As set forth above and as will be shown by proof, there is a high degree of certainty that Plaintiffs and the other heirs of Decedent have suffered those injuries and damages, and that there is an extremely close connection between those injuries and damages and Boeing's conduct. A high degree of moral blame is attached to Boeing's conduct, and the policy of preventing future harm justifies both the recognition of the existence of a duty of care owed by Boeing to Plaintiffs and all the heirs of Decedent and the imposition of all damages described above.

132.    Based on the foregoing, Boeing, acted willfully, wantonly, with oppression, fraud, malice, and/or with a knowing, conscious disregard for the rights and/or safety of others, such that Plaintiffs request that the trier of fact, in the exercise of sound discretion, award Plaintiffs additional damages for the sake of example and sufficient to punish Boeing, for its despicable conduct, in an amount reasonably related to Plaintiffs' actual damages and Boeing's financial condition, yet sufficiently large enough to be an example to others and to deter Boeing and others from engaging in similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

A.      For general damages in an amount according to proof at trial, and beyond the jurisdictional minimum of this Court;

B.      For economic and property losses, in an amount according to proof at trial;

C.      For damages for the Estate of Racha Fatah due to pre-impact injuries and losses;

D.      For interest upon any judgment entered as provided by law;

E.      For all costs of suit incurred herein;

F.      For such other and further relief as the court may deem just and proper.

WHEREFORE, Plaintiffs pray for judgment against Defendant on Counts I through V as follows:

A.      Exemplary damages in an amount according to proof.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all claims in this action.

Dated:  January 3, 2020                Respectfully submitted,


_____
/s/Floyd A. Wisner
One of the Attorneys For Plaintiffs

WISNER LAW FIRM, P.C.
Floyd A. Wisner
Alexandra M. Wisner
514 W. State Street
Suite 200
Geneva, Illinois  60134
Tel: (630) 262-9434
Fax: (630) 262-1066
faw@wisner-law.com
IL Bar #3048713
awisner@wisner-law.com
IL Bar #6317572

THE LAW OFFICE OF BOHRER &
LUKEMAN
Abram I. Bohrer, Esq.*
5 Columbus Circle, Suite 1501
New York, NY  10019
Tel. No.: (212) 406-4232

EMERY CELLI BRINCKERHOFF &
ABADY LLP
Jonathan S. Abady, Esq.*
Andrew G. Celli, Jr., Esq.*
Ilann M. Maazel, Esq.*
David A. Lebowitz, Esq.*
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel. No.: (212) 763-5000

*Attorneys for Plaintiffs*

*Applications for admission *pro hac vice*
forthcoming